William S. Bennet, Plaintiff, *v*. Commercial Advertiser Association, Defendant.

(Supreme Court, New York Special Term, August, 1919.)

**Libel — what not libelous per se.**

> Newspaper articles making specific or general accusations against a public officer, based solely upon official acts which he may lawfully do, are not libelous *per se*.

Motion for judgment on the pleadings.

Bennet & Cooley (A. M. Wattenberg, of counsel), for plaintiff.

Engelhard, Pollak, Pitcher & Stern (Walter H. Pollak and Maurice R. Roche, of counsel), for defendant.

Greenbaum, J. The plaintiff alleges fifteen causes of action for libel based upon as many alleged publications in defendant's newspaper, the *Globe & Commercial Advertiser*. The defendant moves for judg-

ment upon the pleadings, which consist of the complaint and answer. The motion assails the complaint for legal insufficiency. It would involve an unnecessary amount of labor to detail each of the separate causes of action, for the reason that in effect they involve substantially the same questions. It will suffice to state generally the character and nature of the several publications as set forth in the complaint, and of the other allegations therein contained. It appears from the complaint that at the time of the publications the plaintiff was a member of the bar of the state of New York, a member of congress from the twenty-third district of New York, and a candidate for re-election to congress, excepting that as to one of the causes of the action the publication was after the plaintiff failed of re-election. The important legal question is whether the publications concerning plaintiff were only criticisms of him in his official capacity, and whether the articles thus published were what in law is described as " fair criticism." The publications are based upon the facts that the plaintiff, while a member of congress, introduced legislation which prevented the consummation of a recommendation made by Immigration Commissioner Howe for the establishment of a government commissary at Ellis Island for supplying immigrants with food, to supersede the system which then prevailed of granting to a private contractor the exclusive privilege of supplying food to immigrants. The publications charge that the plaintiff defeated the proposal of the immigration commissioner by securing the passage of an amendment proposed by him to a congressional appropriation bill, by means of what was known as a " rider " or " joker," which forbade " the use of any public moneys towards the maintenance at any immigration station of the privileges now

Supreme Court, August, 1919.　　[Vol. 108.

disposed of after public competition.'' The publications also stated that prior to the introduction and passage of the appropriation bill as amended the plaintiff had been the lawyer of the firm which held the commissary contract at Ellis Island. They also called attention to the plaintiff's personal attacks upon Commissioner Howe, charging the latter with immoralities in the conduct of his office, and otherwise assailing his character. The first publication complained of consisted of a letter purporting to have been written to the defendant, in which the writer referred to the case of United States Senator Burton, of Kansas, who had been criminally prosecuted and convicted '' for using his official position in favor of a client,'' and asked: '' Is not Mr. Bennet's action worthy of similar attention from the federal prosecuting attorneys? '' The comment of the defendant in its newspaper upon this letter was that '' it is doubtful if Congressman Bennet is open to legal prosecution,'' inasmuch as '' the plaintiff was the lawyer of the Ellis Island food contractor '' before the plaintiff took his seat in congress. The complaint alleges that this article states: '' When in Congress Mr. Bennet acts as a statesman when he gets a ' rider ' (meaning thereby a provision in an appropriation bill of a legislative character, which nominally had no proper place in such a bill) through, forbidding Commissioner Howe to end the food monopoly for private profit at Ellis Island. Mr. Bennet does not conceal the fact that he is an ' individualist.' According to him, it is merely a coincidence that the benefits of his labors in behalf of individualism go to his former client. Whatever an average man may think of the sufficiency of this defensive explanation, Mr. Bennet seems to have full confidence that he is indictment-proof, and is at full liberty to act in

behalf of his former client, as he might be expected if his former client were his present client." The rest of the article severely criticises the plaintiff in using his office in favor of a former client, and inquiringly asks: "What do his constituents think of him? Do they want to be represented by a man who favors a system under which the poor arriving immigrant is forced, if he wants to eat, to buy a food package from a concern for which the Congressman was formerly an attorney, having received as his fee money presumptively extracted from the immigrants? Do they admire and trust this sort of man, or do they regard him as meanly contemptible?" The second article refers to information coming from Washington "that it is possible to undo the work of Representative William S. Bennet, who inserted a joker in the sundry bill requiring the continuance of the privately operated commissary system on Ellis Island." The next article is typical of other articles, which, after referring to the plaintiff's activities in procuring the passage of the amendment above referred to by means of a "rider," states that the plaintiff "is smarting under his exposure," and that lacking originality, "he adopts the tactics of Congressman Buchanan when that statesman was indicted at the instance of District Attorney Marshall for alleged complicity in war plots." This article concludes as follows: "Congressman Bennet, as the *Globe* has heretofore remarked, is a disgrace to his constituency. Having revealed what sort he is, he is not likely to soften adverse judgment by plunging into silly and childish abuse of those who have exposed him." Succeeding articles contain attacks of the plaintiff of a character similar to those already mentioned, with references to the plaintiff's counter-attacks upon Commissioner Howe. In one of the articles the following

appeared: " Mr. Bennet was their (contractor's) attorney before he went to Congress and at least their friend thereafter. Unfortunately for him, Hudgins & Dumas (the contractors) have lost their concession and will have no use for his services after he quits Congress following the election next month. Three times after he was elected to Congress Mr. Bennet called at the Department of Labor on behalf of Hudgins & Dumas. Once, immediately after he was elected and before he took his seat, Mr. Bennet sought favors from the government for Hudgins & Dumas. Then twice after he took his seat he did the same thing. The last time he appeared before the Department of Labor in behalf of the Ellis Island food purveyors was after they had lost their concession. He then asked the government to be as liberal as possible in the purchase of their plant on Ellis Island. They wanted $15,000 for it. They urged this amount. Mr. Bennet asked the government to be liberal, and then appraisers were appointed, men who knew the value of the plant and had no interest in the matter, one way or the other, and these appraisers gave Hudgins & Dumas about half what they wanted for their plant. This was after Mr. Bennet had asked the Department of Labor to be ' as liberal as possible ' to Hudgins & Dumas, and this request was made while Mr. Bennet was a member of Congress, paid to represent the people of the Twenty-third District, and not Hudgins & Dumas, food contractors at Ellis Island." In short, so far as they relate to facts as distinguishable from comment, the articles of which the plaintiff complains refer to certain lawful official acts of the plaintiff as a congressman; to the fact that he was a candidate for re-election to congress; that before he had been elected to congress he appeared as attorney for certain individuals

in connection with a congressional investigation affecting the concessions which they held at Ellis Island as commissaries for the supplying of food to immigrants; that Mr. Howe, the United States immigration commissioner at Ellis Island, had advocated the passage of a law which sought to abolish private commissaries and to place the matter of furnishing food to immigrants under direct governmental management; that the plaintiff as congressman introduced a " rider " to an appropriation bill in congress which forbade the expenditure of any moneys for the maintenance at any United States immigration station " of any privileges now derived after public competition;" that the plaintiff made personal attacks in congress upon Commissioner Howe, who advocated the abolition of private commissaries. There is, of course, nothing libelous in the publication of the series of lawful official and other acts of the plaintiff as detailed. The portions of the publications which plaintiff claims are libelous *per se* are those which comment upon the acts of the plaintiff such as that he is " meanly contemptible;" that he " favors a system under which the poor immigrant is forced, if he wants to eat, to buy a food package from a concern " for which he was formerly an attorney; that he is " a disgrace to his constituency." One of the articles contains a letter which compares the plaintiff's official actions with those of United States Senator Burton of Kansas, and makes the inquiry whether Mr. Bennet's action is not " worthy of similar attention on the part of the Federal prosecuting authorities." The defendant in commenting upon that letter, however, called attention to the statement made by a member of the firm who held the concessions at Ellis Island to the effect that Mr. Bennet was not their attorney during the term that he was a congressman.

It must be borne in mind that these comments or criticisms deal exclusively with the plaintiff's public official acts.  Accusations against a public officer whether they be specific or general, are not libelous *per se* when they are solely based upon official acts which he may lawfully do.  There is abundant authority for this proposition. *Foot* v. *Pitt,* 83 App. Div. 78, 79; *Rossiter* v. *New York Press Co.,* 141 id. 339, 344; Odgers Lib. & Sland. (8th ed.) 203; *Homer* v. *Engelhardt,* 117 Mass. 539.  The value and force of a representative democratic government would be most seriously impaired if its officials, who are merely the servants of the people, may not freely be criticised concerning their official acts by those who indirectly employ them.  The comments at times may be extreme or unwarranted and unjust, but if they be limited to acts which do not involve illegal action or criminality they are permissible comments.  As was forcefully said by Chief Justice Cockburn in *Wason* v. *Walter,* 4 Q. B. 73, 94: '' though injustice may often be done, and though public men may often have to smart under the keen sense of wrong inflicted by hostile criticism, the nation profits by public opinion being thus freely brought to bear on the discharge of public duties.''  To the same effect see *Seymour* v. *Butterworth,* 3 F. & F. 372, 377, and *Howarth* v. *Barlow,* 113 App. Div. 510, 514, in which Gaynor, J., writing, said: '' The people are not obliged to speak of the conduct of their officials in whispers or with bated breath in a free government, but only in a despotism.  On the contrary, they have a right to speak out in open discussion and criticism thereof, the only test being that they make no false statement; and this is the great safeguard of free government.  This is fundamental among us.''  By becoming a candidate for election to public office one necessarily invites

public scrutiny of his qualifications to discharge the public trust, which he professes to be ready to assume. The blessings of a democratic government can never be fully realized unless a vigilant, alert and intelligent electorate feels it to be a duty of citizenship to inquire into the character and fitness of candidates for public office. Wide publicity of the official acts of a candidate for re-election is peculiarly desirable. The voters should be put in a position to determine whether the official conduct of their representative indicates good judgment and faithful service on his part or subserviency to private interests or self-seeking personal advantage. The law should encourage such criticisms and do naught which may tend to put a restraint thereon. It seems to the court that, as matter of law, the publications of defendant were not libelous *per se*. The cases cited in behalf of the plaintiff deal with defamation of a private individual in his trade or profession and have no bearing upon the state of facts alleged in the complaint. There is no attack here of the plaintiff upon his professional conduct as a lawyer. Defendant's motion for judgment upon the pleadings must be granted with ten dollars costs.

Motion granted, with ten dollars costs.